UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CV-62117-MIDDLEBROOKS
(11-CR-60285-MIDDLEBROOKS)
MAGISTRATE JUDGE REID

TERRANCE LACLIFFE BROWN,

    Movant,

v.

UNITED STATES OF AMERICA,

    Respondent.
_____/

## REPORT OF MAGISTRATE JUDGE

Movant, **Terrance Lacliffe Brown**, has filed a *pro se* Motion to Vacate pursuant to 28 U.S.C. § 2255, alleging that multiple convictions under 18 U.S.C. §§ 924(c) and (j) are now invalid in light of the Supreme Court's decision in *United States v. Davis*, 588 U.S. \_\_\_, 139 S. Ct. 2319 (2019). [CV ECF No. 1]. The Undersigned has reviewed all pertinent portions of the records in both this case and the underlying federal criminal case. For the following reasons, Movant's Motion should be **DENIED**.

### I. Background

A.   <u>Pre-trial Proceedings</u>

Movant, along with his co-defendants, was charged in a Second Superseding Indictment involving a conspiracy to commit robbery against armored car personnel. [CR ECF No. 262]. Count 1 charged Movant with conspiracy to commit Hobbs Act robbery between May 2010 and October 1, 2010; Counts 2 and 4 charged Movant with attempted Hobbs Act robbery for offenses that occurred on July 26, 2010, and September 17, 2010, respectively; Count 6 charged him with

Hobbs Act robbery for an offense that occurred on October 1, 2010; Counts 3, 5, and 7 all charged Movant with using and carrying a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c); and, Count 8 charged Movant with using and carrying a firearm in furtherance of a crime of violence, and in the course of committing the crime of violence, murdering another person under 18 U.S.C. § 924(j).[1] [*Id.*].

In pertinent part, in the Second Superseding Indictment, the § 924(c) charge in Count 3 referenced the crimes in Counts 1 and 2 (conspiracy and attempted Hobbs Act robbery), Count 5 referenced the crimes in Counts 1 and 4 (conspiracy and attempted Hobbs Act robbery), and Counts 7 and 8 referenced the crimes in Counts 1 and 6 (conspiracy and Hobbs Act robbery). [*Id.*]. After a jury trial, Movant was convicted of Count 1 only, with the jury unable to reach a unanimous verdict on the other charges. [CR ECF No. 887]. The Government elected to re-try Movant on the remaining charges. [CR ECF No. 919]. At the conclusion of his re-trial, Movant was found guilty of all remaining charges except Count 5. [CR ECF Nos. 1136, 1147].

B. Facts Adduced at Trial[2]

Movant was the mastermind of a long-running conspiracy to rob Brink's armored trucks involving a crew that included Troiano Johnson, Daryl Davis, Bobby Madison, Hasam Williams, and Nathaniel Moss. [CR ECF No. 1163 at 22-23, 100-02, 113-15]; [CR ECF No. 1171 at 36-39].

On February 22, 2005, Brown, Moss, Madison, Williams, and Davis robbed an armored truck messenger. [CR ECF No. 1163 at 100-02]; [CR ECF No. 1164 at 130]. Brown led and organized that robbery. [*Id.*]. Brown's plan for the robbery was for the crew to arrive at the scene in stolen cars, for Moss and Williams to dress as construction workers, for Moss to hold the

---

[1] Section 924(j) sets forth the sentencing terms for a person who violates § 924(c), and in so doing, causes the death of another person through the use of a firearm.

[2] These facts are mostly from the Government's brief on direct appeal in Eleventh Circuit Case No. 14-13149.

messenger at gunpoint, for Williams to disarm the messenger and take his money bag, and for the other members of the crew to serve as drivers and lookouts. [CR ECF No. 1163 at 102-11]. The crew committed the robbery as planned, stealing approximately $500,000 from the messenger. [*Id.* at 105-11]. The messenger confirmed that he had been robbed at gunpoint on February 22, 2005 by two black males wearing construction vests who stole his firearm and money bag, and he also confirmed that his money bag contained approximately $595,000. [CR ECF No. 1164 at 130].

The crew did not commit any further robberies together until 2010, because Brown was imprisoned from 2005 until 2010. [CR ECF No. 1163 at 112-13]; [CR ECF No. 1164 at 130-31]; [CR ECF No. 1171 at 33]. In May 2010, after Brown was released from prison, he began planning the crew's next robbery of an armored truck. [CR ECF No. 1163 at 113-15].

Brown's target was a Brink's truck at the Bank of America in Lighthouse Point, Florida, which he planned to rob using the same plan as the successful 2005 armored truck robbery. [CR ECF No. 1163 at 115-16, 123, 136-37]. Brown explained to the crew that he had chosen this particular Brink's truck to rob because its driver was old and its messenger was overweight. [*Id.* at 132, 137-38]. On May 25, 2010, Brown and Madison stole vehicles to use during the robbery, but Madison was arrested driving one of the stolen vehicles that night. [*Id*. at 116]; [CR ECF No. 1164 at 217, 230]; [CR ECF No.1171 at 66-67]. A few days later, Brown bailed Madison out of jail. [CR ECF No. 1166 at 33-39]. As a result of Madison's arrest, Brown and Moss stole two different vehicles to use in the Lighthouse Point Bank of America robbery; Moss' cellular telephone records place him in the two areas from which those cars were stolen at the approximate times that they were stolen. [CR ECF No. 1163 at 118-22]; [CR ECF No. 1166 at 93-95, 107-12].

On July 19, 2010, the crew did surveillance on the Lighthouse Point Bank of America, as was confirmed by Moss's and Johnson's cellular telephone records, which placed them both in the

vicinity of the Lighthouse Point Bank of America on that afternoon. [CR ECF No. 1163 at 136-40]; [CR ECF No. 1166 at 112]. Moss, Brown, and the rest of the crew also met at the barbershop owned by Brown's wife and Johnson and met at Davis's home to plan the robbery, and, during those meetings, Brown instructed the crew how to commit the robbery, including ordering that Moss and Williams be the two gunmen and that he, Johnson, Davis, and Madison be the lookouts and drivers. [CR ECF No. 1163 at 130-32, 136-38]; [CR ECF No. 1171 at 35].

On July 26, 2010, the crew met, put on disguises, obtained firearms, and positioned themselves at the Lighthouse Point Bank of America to commit the robbery. [CR ECF No. 1163 at 131-41, 151]. The crew waited for Brown to tell them to commit the robbery via disposable cellular telephones that they all had, but the Brink's truck never arrived. [*Id.* at 142-45]. Brown cancelled the robbery, and he instructed the crew on how to leave the scene while avoiding police detection. [*Id.* at 142-45, 150-61]. Davis's cellular telephone records placed him in the vicinity of the Lighthouse Point Bank of America during the time of the attempted robbery and then back at his residence afterwards. [CR ECF No. 1166 at 73-75]. Moss's cellular telephone records put him in the vicinity of the Lighthouse Point Bank of America at the time of the attempted robbery and showed that Brown and Moss called each other 20 times from that location. [*Id.* at 113]. Madison's cellular telephone records also placed him in the vicinity of the Lighthouse Point Bank of America at the time of the attempted robbery and showed that he engaged in several calls during that time with Brown. [*Id.* at 113-14]. During the time of the attempted robbery, a police alert was issued that a possible stolen vehicle had been located near the Lighthouse Point Bank of America. [CR ECF No. 1164 at 231-33]. By the time the police found the car, it had been abandoned, although the police found Williams, who was armed with a firearm, nearby. [*Id.* at 238-39, 244].

In September 2010, Brown devised a new robbery of a Brink's armored truck for the crew to commit, this time at a Bank of America in Miramar, Florida. [CR ECF No. 1163 at 33-35, 90, 167-68]. Brown told the crew that he chose this location because the driver of the truck was old, and the messenger was out of shape. [*Id.*]. Brown did surveillance on the Brink's truck at the Miramar Bank of America on September 10, 2010, as is reflected by both a surveillance video and by location information taken from Brown's and Johnson's cellular telephone records. [*Id.* at 33-36, 168-70]; [CR ECF No. 1165 at 190-91]; [CR ECF No. 1166 at 89]. Brown organized all of the details of the robbery, including its time, its location, how the firearms were to be used, the roles everyone was to play, and that Moss was to wear a bright orange construction vest so as to not look suspicious. [CR ECF No. 1163 at 22-23, 30-31].

On September 17, 2010, the crew met at Davis's house to prepare to rob the Brink's truck at the Miramar Bank of America, and, during that meeting, Brown instructed the crew that the robbery would be committed using stolen cars, using Moss and a new crew member named Soldier as the gunmen, using Madison as the getaway driver, and using Brown, Davis, and Johnson as the lookouts. [CR ECF No. 1163 at 171-74]; [CR ECF No. 1171 at 150]. The crew then traveled to the Miramar Bank of America to commit the robbery, communicating via disposable cellular telephones so that Brown could put everyone in position and tell them when to commit the robbery. [CR ECF No. 1163 at 174-78].

Due to a nearby traffic accident, there were police in the area of the Miramar Bank of America when the crew arrived, which scared Madison. [CR ECF No. 1163 at 178-79]; [CR ECF No. 1171 at 155]. Madison drove away with Moss and Soldier in his car, and then Moss, Soldier, and Madison ran out of Madison's car, jumped over a neighbor's fence, ran through her backyard, jumped over the fence on the other side of her yard, got into the getaway vehicle that had been left

there for Moss and Soldier to use after the robbery, and fled. [CR ECF No. 1163 at 179-82]. As a result of their flight, the September 17, 2010 robbery was not completed. [*Id.* 183-84].

Video and photographic surveillance from neighboring businesses showed the crew's cars at the Miramar Bank of America on September 17, 2010 and showed Madison's flight. [CR ECF No. 1163 at 186-92]. The owner of the yard through which Moss, Soldier, and Madison ran, Susana Plaza, saw three men, one of whom she recognized as Moss wearing an orange construction vest, jump over her fence, cross her yard, jump back over her fence, and get into a car that was waiting for them. [CR ECF No. 1177 at 27-29]. In addition, cellular telephone records confirm that the crew, using a series of three-way calls, were on disposable cellular phones in the vicinity of the Miramar Bank of America at the time that the robbery was supposed to have occurred. [CR ECF No. 1165 at 120-33]. Brown's cellular telephone records also placed him at the location from which one of the vehicles was stolen and in the vicinity of Davis' house on the morning of September 17, 2010. [*Id.* at 191-93]. Williams's, Johnson's, and Moss's cellular telephone records all placed them in the vicinity of the Miramar Bank of America at the time of the attempted robbery, and all three of those cellular telephones were in constant contact with Brown's cellular telephone during that time. [CR ECF No. 1166 at 76-86, 89, 115-16]. Davis' cellular telephone records also showed that he made multiple telephone calls to Brown on September 17, 2010, including from the vicinity of the Miramar Bank of America. [*Id.* at 79-82].

The crew decided to try its robbery of the Brink's truck at the Miramar Bank of America again. Late on the evening of September 30, 2010, Moss and Brown stole two cars to use in the robbery. [CR ECF No. 1163 at 39-50]. On the morning of October 1, 2010, Brown, Moss, Johnson, Jermaine Parish, Soldier, Williams, and Davis all met at Davis' residence to prepare to rob the Brink's truck at the Miramar Bank of America. [*Id.* at 31, 50]. Brown reminded the crew of the

6

plan, which was that Moss and Solider were the gunmen who would steal the money bag from the Brink's messenger while Parish would be the getaway driver and Brown, Johnson, Williams, and Davis would all be the lookouts. [*Id.* at 10-11, 22, 38, 51]. The crew then left Davis' house in a series of vehicles, including the two stolen cars, and traveled to the Miramar Bank of America. [*Id.* at 52-55]. Brown positioned the crew for the robbery using disposable cellular telephones. [*Id.* at 55-56]; [CR ECF No. 1164 at 36-37].

After the crew positioned themselves around the Miramar Bank of America, the Brink's truck arrived, and the messenger exited the truck. [CR ECF No. 1163 at 58]. Brown directed Moss and Soldier to "go," and, in response, Moss got out of his car, grabbed the messenger, and held him at gunpoint against the wall. [*Id.* at 61]. Soldier then exited his car "swinging his gun like a mad man telling people to get back into the bank," grabbed the money bag from the messenger, and fled. [*Id.* at 61]. The driver of the Brink's truck opened his door and leaned out of the truck. [*Id.* at 63]. Moss ordered the driver not to shoot, telling him that if he shot, he would kill the messenger. [*Id.*]. The driver got back inside the truck, but he shot at Moss through a crack in the door. [*Id.*]. In response, Moss shot at the windshield of the truck, but he did not hit the driver. [*Id.* at 63-64]. Moss then shot and killed the messenger. [*Id.* at 10, 64]; [CR ECF No. 1164 at 21, 127].

After he killed the messenger, Moss ran towards the getaway car, which he had to reach by jumping over a fence, running through Plaza's neighboring yard, and jumping over another fence. [CR ECF No. 1163 at 65-66]. Moss, however, noticed once he was in Plaza's yard that the getaway car was already gone, so he hid in the bushes of Plaza's yard until a police dog located him. [*Id.* at 66-68]; [CR ECF No. 1177 at 26]. Moss was then arrested. [CR ECF No. 1171 at 119].

A surveillance video from a neighboring restaurant on October 1, 2010 showed two men committing the robbery of the messenger, one of the men getting into a vehicle and driving away,

and Brown's black Dodge Charger at the scene of the crime. [CR ECF No. 1163 at 80-85, 92-97]; [CR ECF No. 1171 at 120-22]. Brown was issued a traffic ticket while driving that Dodge Charger on September 2, 2010. [CR ECF No. 1171 at 25]. Brown's cellular telephone records placed his cellular telephone at his house the morning of October 1, 2010 and showed that he called Moss and Williams; placed his telephone in the vicinity of Davis's residence and showed that he made and received calls to and from Moss, Williams, and Davis; and placed his telephone in the vicinity of the Miramar Bank of America at the time of the robbery and show that it made or received calls to and from Davis and Williams. [CR ECF No. 1165 at 197-99]; [CR ECF No. 1166 at 117-18]. Records from the disposable cellular telephones show that the telephones began the day in the vicinity of Brown's residence, were then in the vicinity of Davis's residence, and then were in the vicinity of the Miramar Bank of America. [CR ECF No. 1165 at 195-98]. Johnson's cellular telephone records placed him at the Miramar Bank of America at the time of the robbery. [CR ECF No. 1166 at 90, 119].

In addition, Plaza and Camden Thompson were in the area of the Miramar Bank of America around noon on October 1, 2010, and they both heard two gunshots and saw Moss and Solider running from the bank. [CR ECF No. 1177 at 13-16, 21-23]; [CR ECF No. 1164 at 128-29]. Plaza also saw Moss and Soldier jump over the fence into her yard and hide. [CR ECF No. 1177 at 13-16, 21-23].

At 5:30 pm on October 1, 2010, a team of Federal Bureau of Investigation ("FBI") agents conducted surveillance on Brown's residence. [CR ECF No. 1165 at 221-23]. Shortly after they began their surveillance, Madison arrived and sat down in Brown's front yard, a vehicle used by the Brown family arrived, Madison walked up to the vehicle's black male driver, and the two engaged in a brief conversation. [*Id.* at 225]. The vehicle then left, and Madison returned to

Brown's front yard. [*Id.* at 226-27]. Madison next spoke to a teenager who came out of a neighboring house, the teenager walked up the street, and the teenager came running back down the street holding a cellular telephone that he gave to Madison. [*Id.* at 226-27]. After Madison spoke on that telephone, he walked up to Brown's house, knocked on the door, and went inside for approximately two minutes before leaving. [*Id.* at 227-28]. The FBI agents then asked Brown's wife, who was in the residence, about Brown's location, but she told them that she did not know where he was. [CR ECF No. 1171 at 55-56]. Brown's wife stated that she did not hear from or see Brown until one to two days after the October 1, 2010 robbery, and she stated that Brown, even though he had never missed one of his son's football games before and she had expected him to be there, did not attend his son's football game on October 1, 2010. [*Id.* at 58-61, 77]. Brown's wife requested a meeting with Doral Police Officer Gerard Starkey, and she provided Officer Starkey with personal information about Brown. [*Id.* at 113, 124-30].

Brown had prior experience robbing armored truck messengers with another crew. [CR ECF No.1163 at 153-55]. In 2001, Brown participated in a conspiracy to rob a Brink's truck in North Miami, providing the stolen vehicles used to complete the crime, which was executed by two gunmen, one of whom wore a construction vest to blend in with the crowd. [CR ECF No. 1164 at 134, 144-45]. The two gunmen pulled their weapons on the Brink's messenger as he entered the bank, stole his firearm and money bag, and fled using the stolen vehicles. [*Id.* at 151-52].

After the 2001 robbery, Brown suggested that this crew rob a Brink's truck at a bank in Miramar on which he had been conducting surveillance. [CR ECF No. 1164 at 154-55]; [CR ECF No. 1172 at 47-48]. The crew, however, decided to rob an armored truck in 2003 in South Carolina instead. [CR ECF No. 1164 at 156-58]. That crew and Brown traveled to South Carolina in a van rented by Brown, conducted surveillance on the robbery location, and decided to again use the two

gunmen plan while Brown was the getaway driver using a car that he had stolen just before the robbery. [*Id.* at 160-68]. The crew executed the robbery by having two gunmen pull their firearms on the messenger, steal the messenger's firearm and money bag, and flee in the getaway car driven by Brown. [*Id.* at 170-78]. Once the crew returned to Miami, Brown again told them that he wanted to rob the Brink's truck at the bank in Miramar. [*Id.* at 179].

C. Verdict, Sentencing, and Appeal

Movant was convicted of all of the remaining charges, except for Count 5. [CR ECF No. 1136]. Movant was sentenced to a total of 35 years' imprisonment, consisting of 2 years as to each of Counts 1, 2, 4, and 6, all to run concurrently with each other; 5 years as to Count 3, to run consecutive to Counts 1, 2, 4 and 6; 25 years as to Count 7, to run consecutive to Counts 1, 2, 4, and 6; and, 3 years as to Count 8, to run consecutive to all other counts. [CR ECF No. 1147]. Movant appealed. The Eleventh Circuit affirmed Movant's judgment of conviction in a written opinion. *See United States v. Brown*, 630 F. App'x 947 (11th Cir. 2015).

## II. Procedural Default

It must first be determined whether Movant procedurally defaulted his *Davis* claim. Respondent argues that Movant's *Davis* claim is procedurally defaulted because it was not first raised on direct appeal. [CV ECF No. 7 at 3]. Movant does not address this argument in his Motion.

Pursuant to the procedural default rule, a prisoner may move the sentencing court to vacate his sentence under 28 U.S.C. § 2255 on the ground that his sentence was imposed in violation of federal law or the Constitution or exceeds the maximum time allowed by law. *See* 28 U.S.C. § 2255(a). However, "a collateral challenge, such as a § 2255 motion, may not be a surrogate for a direct appeal." *Lynn v. United States,* 365 F.3d 1225, 1232 (11th Cir. 2004) (*per curiam*) (citing *United States v. Frady,* 456 U.S. 152, 165 (1982) (collecting cases)).

As such, general rules have developed that: "(1) a defendant must assert all available claims on direct appeal," and (2) "relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'" *Id.* at 1232 (quotations and internal citations omitted).

When a claim is not pursued on direct appeal, it will not be considered in a motion for § 2255 relief unless the movant can avoid a procedural default by establishing objective cause for failing to properly raise the claim and actual prejudice resulting from the alleged constitutional violation. *Rose v. United States,* 738 F. App'x 617, 624 (11th Cir. 2018) (*per curiam*) (citing *United States v. Nyhuis,* 211 F.3d 1340, 1344 (11th Cir. 2000)).

A. Cause

Cause for not raising a claim can be shown when a claim "is so novel that its legal basis was not reasonably available to counsel." *Id.* at 626 (quoting *Bousley v. United States,* 523 U.S. 614, 622 (1998)). The Eleventh Circuit has made clear that, where the Supreme Court of the United States invalidates as unconstitutional the residual clause as it did in *Johnson*[3] and then *Davis,* overruling its own prior precedents on the exact issue, Movant could not have had "'a reasonable basis' upon which to raise a vagueness challenge to the residual clause'" at any time prior to his conviction becoming final in 2006. *See id.* at 626-28 (quoting *Reed v. Ross,* 468 U.S. 1, 17 (1984)).

Accordingly, Movant has cause to excuse the procedural default because his *Davis* claim was previously unavailable at the time of his direct appeal. *See In re Hammoud,* 931 F.3d 1032, 1040 (11th Cir. 2019). In *Hammoud,* the Eleventh Circuit reviewed and granted an application to

---

[3] In *Johnson v. United States*, 576 U.S. 591 (2015), the Supreme Court held that imposing an increased sentence under the residual clause of the Armed Career Criminal Act violates due process.

file a successive § 2255 motion, finding it was a new rule of substantive constitutional rule, separate and apart from *Johnson* and *Dimaya*.[4] *See id.* This necessarily means that Movant's *Davis* claim was, in fact, previously unavailable to Movant before June 24, 2019.[5]

Because the *Davis* claim was previously unavailable to Movant, and it was not "reasonably available to counsel at the time of his direct appeal," Movant has demonstrated cause to excuse the procedural default of the claim. *See id.*; *see also Lynn,* 365 F.3d at 1232 (citing *United States v. Mills,* 36 F.3d 1052, 1055 (11th Cir. 1994) (*per curiam*)).

B. Prejudice

Movant must also demonstrate prejudice to warrant habeas corpus relief. To demonstrate prejudice arising from the procedural default, Movant must show "not merely that the errors at trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Brown v. United States,* 720 F.3d 1316, 1333 (11th Cir. 2013) (quoting *Frady,* 456 U.S. at 170). Movant must show that there is a reasonable probability that but for the error, his conviction or sentence would have been different. *See Mincey v. Head,* 206 F.3d 1106, 1147 (11th Cir. 2000) (holding that the showing of prejudice necessary to overcome a procedural default is the same showing of prejudice required by *Strickland v. Washington,* 466 U.S. 668, 687 (1984)).

If Movant can show that he has suffered an "illegal sentence" as to his §§ 924(c) and (j) convictions, then he has sufficiently demonstrated actual prejudice as a matter of law and habeas

---

[4] In *Sessions v. Dimaya*, 584 U.S. ___ , 138 S. Ct. 1204 (2018), the Supreme Court held that the residual clause of the federal code's definition of "crime of violence," as incorporated into the Immigration and Nationality Act's definition of aggravated felony, was impermissibly vague in violation of due process.

[5] The Eleventh Circuit has previously explained that an argument is "novel" where "a court has articulated a constitutional principle that has not been previously recognized but which has been held to have retroactive application," and "must be a sufficiently clear break with the past, so that an attorney representing the defendant would not reasonably have had the tools for presenting the claim. . . ." *See Howard v. United States,* 374 F.3d 1068, 1072 (11th Cir. 2004) (internal quotations and citations omitted).

corpus relief may be warranted. See *Mays v. United States,* 817 F.3d 728, 737 n. 12 (11th Cir. 2016) ("An illegal sentence warrants habeas corpus relief where a sentencing error affects the defendant's substantial rights and seriously affects the fairness, integrity, or public reputation of the judicial proceedings.") (quoting *United States v. Sanchez,* 586 F.3d 918, 930 (11th Cir. 2009) (internal quotation marks omitted)). For the reasons discussed below, Movant will not be able to satisfy the prejudice component in order to overcome the procedural default of his *Davis* claim.

C. Fundamental Miscarriage of Justice

Even absent a showing of cause and prejudice, under exceptional circumstances, Movant may also obtain federal review of a procedurally defaulted claim if such review is necessary to correct a fundamental miscarriage of justice, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Bousley,* 523 U.S. at 622. "Actual innocence" means factual innocence, not mere legal insufficiency. *Id.* at 623. For the reasons discussed below, Movant cannot demonstrate that a fundamental miscarriage of justice will result from the procedural default of his *Davis* claim as to his §§ 924(c) and (j) convictions because he has not shown he is factually innocent of those offenses.

**III. Standard of Review**

A. 28 U.S.C. § 2255

"A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution . . . may move the Court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255(a). Because collateral review is not a substitute for a direct appeal, the grounds for collateral review on final judgments pursuant to § 2255 are extremely limited. *See Frady,* 456 U.S. at 165.

A prisoner is entitled to relief under § 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack. *See* 28 U.S.C. § 2255(a); *see also McKay v. United States,* 657 F.3d 1190, 1194 n.8 (11th Cir. 2011). Thus, relief under § 2255 is reserved for transgressions of constitutional rights, and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice. *See Frady,* 456 U.S. at 165; *see also Lynn,* 365 F.3d at 1232 (citations omitted). If a court finds a claim under § 2255 valid, the court shall vacate and set aside the judgment, and discharge the prisoner, grant a new trial, or correct the sentence. *See* 28 U.S.C. § 2255. On collateral review, Movant must "clear a significantly higher hurdle than would exist on direct appeal." *Frady,* 456 U.S. at 166.

B. Burden of Proof

Respondent argues that Movant bears the burden of proving his claim, relying on *Beeman v. United States,* 871 F.3d 1215, 1222 (11th Cir. 2017) (quoting *Rivers v. United States,* 777 F.3d 1306, 1316 (11th Cir. 2015)). [CV ECF No. 7 at 10-11].

The Eleventh Circuit has made clear that, in the post-conviction context, in order to be entitled to relief, a § 2255 movant, not the government, must demonstrate that "it is more likely than not" that the jury based its § 924(c) guilty verdict solely on the non-qualifying Hobbs Act robbery conspiracy, and not on one of the other valid, qualifying predicate offenses identified in the Second Superseding Indictment. *See Reyez v. United States*, 794 F. App'x 925, 926 (11th Cir. 2020) (*per curiam*) (citing *Hammoud,* 931 F.3d at 1041; *Beeman,* 871 F.3d at 122-25); *see also In re Cannon,* 931 F.3d 1236, 1243 (11th Cir. 2019) (reiterating Movant bears the burden of proving the likelihood the jury based its verdict solely on the non-qualifying predicate offense and not also

14

on one of the other valid predicate offenses); *Rosales-Diaz v. United States,* 806 F. App'x 660, 665 (11th Cir. 2020).

### IV. Discussion

Respondent acknowledges that conspiracy to commit Hobbs Acct robbery is not a crime of violence under the elements clause of § 924(c)(3)(A), and thus cannot form the basis of a § 924(c) conviction after *Davis*. [CV ECF No. 7 at 1]. However, Respondent argues the Movant cannot meet his burden of proof that the jury's verdicts on Counts 3, 7, and 8, which involved violations of §§ 924(c) and (j) were not based on his attempted Hobbs Act Robbery and substantive Hobbs Act robbery offenses. Respondent cites *Cannon* and *Beeman* in support of this argument. [CV ECF No. 7 at 9-11].

In *Cannon*, the applicant was challenging his §§ 924(c) and (o) convictions on the basis that one of the underlying predicates – conspiracy to commit Hobbs Act robbery – no longer qualified as a crime of violence under the residual clause of § 924(c)(3)(B). *See Cannon*, 931 F.3d at 1240. He also asserted that his indictment charged multiple predicate crimes in a single § 924(c) and (o) count. *See id.* at 1241.

The Eleventh Circuit found that two of the applicant's § 924(c) convictions relied upon predicates that survived *Davis*. *See id.* at 1242. As to the § 924(o) conviction, the court found that there were multiple predicate offenses, including two car jackings, four drug crimes and one conspiracy to commit Hobbs Act robbery. *See id.* at 1243. The Court observed that "Cannon's predicate crimes seem **inextricably intertwined**" because "it is difficult to see how a jury would have concluded that [he] was guilty of using a firearm during an in furtherance of the underlying Hobbs Act predicates without at the same time also concluding that he did so during and in furtherance of the underlying drug and carjacking predicates." *Id*. (emphasis added). Since the jury

15

returned a general verdict that did not specify which offense served as the predicate, the court found the defendant had made a *prima facie* showing that his claim satisfied the criteria of § 2255(h). *See id*. The Eleventh Circuit noted that even if the district court found that conspiracy to commit Hobbs Act robbery was no longer a valid predicate, the defendant still bore the burden of proving the likelihood that the jury based its verdict solely on the conspiracy charge and not also on the other valid predicate offenses. *See id*. (citing *Beeman*, 871 F.3d at 1222).

In *Beeman*, the Eleventh Circuit addressed whether the movant could prove a *Johnson* claim. The court found that "the movant must show that – more likely than not – it was the use of the residual clause that led to the sentencing court's enhancement of his sentence." *Id*. at 1222. The court further found that "[i]f it is just as likely that the sentencing court relied on the elements or enumerated offenses clause, solely or as an alternative basis for the enhancement, then the movant has failed to show that his enhancement was due to the residual clause." *Id*. "In the face of a silent record, this can be difficult, or even insurmountable, but it remains the defendant's burden nonetheless." *United States v. Dugas*, No. 5:16-CV-95/MCR/MJF, 2020 WL 535696, at *2 (N.D. Fla. Jan. 31, 2020) (citing *Beeman*, 871 F.3d at 1223-24).

With this background in mind the question here is whether Movant can establish that it is more likely than not the jury relied solely upon the conspiracy to commit Hobbs Act robbery predicate. This is so because the law is clear that both Hobbs Act robbery and attempted Hobbs Act robbery remain valid predicates under § 924(c)'s elements clause. *See In re Saint Fleur*, 824 F.3d 1337, 1340-41 (11th Cir. 2016) (addressing Hobbs Act robbery); *see also In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016) (addressing aiding and abetting Hobbs Act robbery); *United States v. St. Hubert*, 909 F.3d 335 (11th Cir. 2018) (addressing attempted Hobbs Act robbery).

As set forth in the facts section above, the overarching conspiracy to commit Hobbs Act robbery charge in Count 1, was inextricably intertwined with Movant's charges for attempted and substantive Hobbs Act robbery in that Movant committed the attempted and substantive Hobbs Act robberies during the course of, and in furtherance of, the conspiracy. Accordingly, because of the intertwined nature of the offenses, Movant cannot demonstrate under *Beeman* that his §§ 924(c) and (j) convictions more likely than not rested on the now-invalid residual clause. *See Cannon,* 931 F.3d at 1243.

Moreover, as previously discussed, Movant was initially tried on all counts. [CR ECF No. 887]. The jury returned a guilty verdict only as to Count 1, the conspiracy to commit Hobbs Act robbery charge, and was unable to come to a unanimous verdict on the remaining charges. [*Id*.]. Thus, after the Government elected to retry Movant on the remaining charges, the second empaneled jury *was not instructed* on that conspiracy charge because that count had already been resolved. Consequently, when the jury was instructed as to the §§ 924(c) and (j) charges, *they were not told that they could find Movant guilty of those charges if he possessed or used a firearm in furtherance of the conspiracy charged in Count 1*. Rather, they were expressly informed as follows:

> Count 2 charges that on July 26, 2010 the Defendant knowingly attempted to affect commerce by robbing guards employed by Brink's using actual or threatened force, violence, and fear of injury.
>
> Count 3 charges that on or about July 26, 2010, the Defendant knowingly carried and used a firearm during and in relation to the armored-car robbery attempt in Count 2.
>
> Count 4 charges that one or about September 17, 2010, the Defendant knowingly attempted to affect commerce by robbing guards employed by Brink's using actual or threatened force, violence, and fear of injury.
> Count 5 charges that on or about September 17, 2010, the Defendant knowingly carried and used a firearm during and in relation to the armor-car robbery attempt charged in Count 4.

17

> Count 6 charges that on or about October 1, 2010, the Defendant knowingly affected commerce by robbing guards employed by Brink's using actual or threatened force, violence, and fear of injury.
>
> Count 7 charges that on or about October 1, 2010, the Defendant knowingly carried and used a firearm <u>during and in relation to the armored-car robbery charged in Count 6</u>.
>
> Count 8 charges that on or about October 1, 2010, the Defendant knowingly carried and used a firearm <u>during and in relation to a crime of violence, and in the course of the offense, caused the murder of another</u>.

[CR ECF No. 1134 at 12-13] (emphasis added).

Specific to the §§ 924(c) and (j) counts, the jury was instructed that Movant could only be found guilty of using or carrying a firearm during and in relation to a crime of violence if they found that he committed the crimes of violence as charged in Counts 2, 4, and 6 beyond a reasonable doubt. [*Id.* at 16]. The jury was not instructed that any conspiracy could serve as a "crime of violence" with respect to the §§ 924(c) or (j) charges.

Ultimately, Movant was found not guilty as to the § 924(c) charge in Count 5. [CR ECF No. 1136]. However, the jury did find beyond a reasonable doubt that he was guilty of both attempted Hobbs Act robbery, as charged in Count 2, and substantive Hobbs Act robbery, as charged in Count 6. [*Id.*]. Consequently, in light of the jury's verdicts on these charges, Movant cannot establish that it is more likely than not that his §§ 924(c) and (j) convictions in Counts 3, 7, and 8 rested solely upon the predicate of conspiracy to commit Hobbs Act robbery. Under *Beeman*, Movant has not met his burden to show that it is more likely than not that his § 924 convictions relied upon the now invalidated residual clause rather than the elements clause.[6] His Motion should therefore be denied.

---

[6] Under *Beeman*, where "the evidence does not clearly explain what happened…the party with the burden loses." *Beeman*, 871 F.3d at 1225 (internal citation omitted).

## V. Certificate of Appealability

A prisoner seeking to appeal a district court's final order denying his motion to vacate has no absolute entitlement to appeal, and to do so, must obtain a certificate of appealability ("COA"). *See* 28 U.S.C. § 2253(c)(1); *see also Harbison v. Bell*, 556 U.S. 180, 183 (2009). This Court should issue a COA only if the movant makes "a substantial showing of the denial of a constitutional right." *See* 28 U.S.C. § 2253(c)(2). Where a district court has rejected a petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). However, when the district court has rejected a claim on procedural grounds, the petitioner must show that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and . . . the district court was correct in its procedural ruling." *Id.* Upon consideration of the record as a whole, the Court should deny a COA. Notwithstanding, if Movant does not agree, he may bring this argument to the attention of the District Judge in objections.

## VI. Conclusions and Recommendations

Based on the foregoing, it is **RECOMMENDED** that:

1. the Motion to Vacate [ECF No. 1] be **DENIED** on the merits;

2. a certificate of appealability **NOT BE ISSUED**; and,

3. the case **CLOSED**.

Objections to this Report may be filed with the District Judge within fourteen days of receipt of a copy of the Report. Failure to timely file objections will bar a *de novo* determination by the District Judge of anything in this recommendation and shall constitute a waiver of a party's "right to challenge on appeal the district court's order based on unobjected-to factual and legal

conclusions." *See* 11th Cir. R. 3-1 (2016); *see also* 28 U.S.C. § 636(b)(1)(C); *Harrigan v. Metro-Dade Police Dep't Station #4*, 977 F.3d 1185, 1191-92 (11th Cir. 2020).

Signed this 20th day of January, 2021.

_____
UNITED STATES MAGISTRATE JUDGE

cc: Terrance Brown
63666-004
Coleman Medium
Federal Correctional Institution
Inmate Mail/Parcels
Post Office Box 1032
Coleman, FL 33521
PRO SE

Mark Dispoto
United States Attorney's Office
500 E Broward Boulevard
7th Floor
Fort Lauderdale, FL 33301-3002
561-820-8711
Fax: 561-820-8777
Email: mark.dispoto@usdoj.gov